In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00464-CV**
_____

**IN THE INTEREST OF H.M.**

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Cause No. CV1712144**

**MEMORANDUM OPINION**

Mother and Father appeal the trial court's judgment terminating the parent-child relationships between "Beth,"[1] her Mother, and her Father. Mother and Father each filed appeals. In Father's appeal, his court-appointed appellate counsel submitted a brief that contends no arguable grounds can be advanced to support

---

[1] To protect the identity of the minor child that is discussed in the opinion, we have used pseudonyms for her name, as well as her parents and other members of her family. *See* Tex. R. App. P. 9.8(a), (b).

1

Father's appeal.[2] In Mother's appeal, Mother's court-appointed appellate counsel filed a brief raising six issues for our review. We affirm the trial court's judgment terminating the parent-child relationships between Beth and her Mother and between Beth and her Father.

## Background

The Department of Family and Protective Services (the Department) initiated the proceedings that resulted in the termination of Mother's and Father's parental rights in early-June 2017, when Beth was nearly five years old. Two events, both of which occurred in late-April 2017, led the Department to investigate Mother's ability to care for Beth.[3] According to the Department's investigator, who testified in the trial, someone from Beth's school reported to the Department that Beth had not come to school. When a school employee went to Mother's home, the school employee,

---

[2] *See Anders v. California*, 386 U.S. 738 (1967); *see also In re L.D.T.*, 161 S.W.3d 728, 731 (Tex. App.—Beaumont 2005, no pet.) (holding that *Anders* procedures apply in parental-rights termination cases).

[3] Mother, Father, and Beth lived together until Mother and Father were involved in some type of altercation with each other that resulted in Father's arrest, which occurred in March 2015. Father was sentenced to prison following the altercation, and he was still in prison when the case was tried in mid-October 2019. During the trial, Father testified that he was in prison based on his conviction for obstruction and retaliation. He also testified he expected to be released, on parole, in June 2019. He also agreed that based on his conviction, he received an eight-year sentence that ends in 2023, not 2019.

according to the investigator, found that Mother was passed out and that the home smelled of marijuana. The second report came from some unidentified law enforcement official. According to the investigator, the official reported seeing marijuana and open bottles of pills in Mother's home.

The same day the Department received these reports, its investigator met with Beth and her teacher and arranged to meet with Mother at Mother's home. During the meeting, Mother showed the investigator her prescription bottles. Mother also told the investigator that a caregiver was helping her manage her medications. Mother told the investigator that she did not have marijuana in her home, and she claimed that if anyone saw it there, it belonged to her brother-in-law, who was also assisting her in her home. Finally, Mother told the investigator that she obtained additional assistance from a neighbor who helped her daily. Based on the Department's initial investigation into whether Mother was caring for Beth, the investigator concluded that the Department did not need to remove Beth from Mother's home given the assistance she was getting and because one of Mother's neighbors agreed to monitor the situation and report any concerns to the Department.

On May 11, 2017, Mother informed the investigator that she no longer had a caregiver. On May 31, 2017, the investigator learned that the agency that had been providing Mother with a caregiver quit doing so because the agency determined that

Mother required a higher level of care than it could provide. When the investigator attempted to contact Mother to discuss whether Mother still had someone to help her with her medications, Mother failed to respond to the investigator's phone calls or text messages. On June 1, 2017, the investigator met with Beth at her school. Ultimately, the investigator learned that Beth's mother was not home and that she had been hospitalized. The investigator went to the hospital, where she saw Mother. According to the investigator, Mother was "incoherent" at the hospital. The investigator stated Mother was "able to say her name[,]" was aware she had been hospitalized, and "that was about it." That same day, the Department decided to remove Beth from Mother's custody because Mother, at that point, could not care for Beth and the Department was not able to find another family member who could care for her.

In early-June 2017, the Department sued Mother and Father seeking to terminate their respective rights to parent Beth. Three days after the Department sued, the trial court signed an emergency temporary order naming the Department as Beth's sole managing conservator. Following an adversarial hearing, the trial court signed a temporary order, which established the requirements that Mother and Father needed to meet to have Beth returned to their care. The temporary order

4

required Mother and Father to comply with a parenting plan created by the Department.

In October 2019, the parties tried the case to the bench. Both Mother and Father were represented by attorneys. Six witnesses testified during the trial. While Father testified in the trial, Mother did not. When the trial ended, the trial court terminated Father's rights under subsections D, E, O, and Q of the Texas Family Code.[4] The trial court terminated Mother's parental rights under subsections B, D, E, N, and O of the Texas Family Code.[5] The court also found that terminating Father's and Mother's respective parent-child relationship with Beth is in Beth's best interest, and it appointed the Department to be Beth's managing conservator.[6]

## Analysis

### I. Father's Appeal

Father's court-appointed appellate counsel filed an *Anders* brief in Father's appeal.[7] We have reviewed the brief, and it complies with the requirements that

---

[4] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (Q) (West Supp. 2018).

[5] *See id.* § 161.001(b)(1)(B), (D), (E), (N), (O) (West Supp. 2018).

[6] *See id.* § 161.001(b)(2) (West Supp. 2018).

[7] *See Anders*, 386 U.S. at 744; *In re L.D.T.*, 161 S.W.3d at 731.

apply to such briefs. The brief presents an attorney's professional evaluation of the record and explains why, as it relates to Father, no arguable grounds exist to overturn the trial court's judgment.[8] Father's court-appointed appellate counsel also represented to the Court that she gave Father a copy of the brief that she filed in Father's appeal, notified Father of his right to file a *pro se* brief, and explained how Father could review a copy of the record pertinent to his appeal. Father has not filed a *pro se* response.

After reviewing the record and counsel's brief, we conclude that no arguable grounds exist to support Father's appeal and that Father's appeal is frivolous.[9] As to Father, we affirm the trial court's judgment terminating his parent-child relationship with Beth.

## II. Mother's Appeal

Mother contends the evidence admitted in the trial is insufficient to support terminating her parental rights under all grounds on which the judgment is based. She also argues that terminating her rights is not in Beth's best interest.[10]

---

[8] *See In re D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied).

[9] *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *see also In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.); *In re D.D.*, 279 S.W.3d at 850.

[10] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(B), (D), (E), (N), (O), (b)(2).

A. Standard of Review

First, we note the standards of review that apply to legal and factual insufficiency issues. To involuntarily terminate a parent's rights, the factfinder must conclude, by clear and convincing evidence, that (1) the parent committed one or more of the prohibited acts or omissions listed in section 161.001(b)(1) of the Family Code, and that (2) terminating the parent's rights to her child is in the child's best interest.[11] Section 161.001(b)(1) of the Texas Family Code currently lists twenty-one grounds authorizing trial courts to terminate a parent-child relationship when terminating the relationship is in the child's best interest.[12] Nevertheless, the trial court need only find one of the statutory grounds exists and that terminating the relationship is in the child's best interest to justify terminating the parent-child relationship.[13]

Under the standards that apply to legal insufficiency claims, appellate courts must consider the evidence "'in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that

---

[11] *See id.* § 161.001(b)(1), (b)(2) (West Supp. 2018).

[12] *See id.* § 161.001(b)(1).

[13] *See In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014).

7

its finding was true.'"[14] In doing so, appellate courts assume that the factfinder resolved disputed facts in a manner that favors its finding, if a reasonable factfinder could have done so.[15] Thus, an appellate court must disregard all evidence that a reasonable factfinder could have, by inference, disbelieved or found incredible.[16] Should the appellate court determine that a reasonable factfinder could reasonably form a firm belief or conviction that the matter that must be proven is true, it must conclude that legally sufficient evidence supports the finding that the parent has complained about in the appeal.[17]

Under the factual sufficiency standard of review, we consider and weigh all the evidence in the record, giving deference to the findings the factfinder reached so that we do not supplant the verdict the factfinder made with our own.[18] "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably

---

[14] *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

[15] *In re J.F.C.*, 96 S.W.3d at 266.

[16] *Id.*

[17] *See In re J.L.*, 163 S.W.3d at 85.

[18] *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

have formed a firm belief or conviction, then the evidence is factually insufficient.'"[19] When conducting a factual sufficiency review, the appellate court must give due deference to the factfinder's findings, and it must avoid substituting its own judgment for that of the factfinder.[20]

B. Analysis—Statutory Finding

While the trial court terminated Mother's rights under five separate sections of the Family Code, we will first address the arguments Mother raises in her fifth issue, which argues that not enough evidence was admitted in the trial to support the trial court's finding that she violated the requirements of a court order.[21] The pertinent statutory subsection authorizing a trial court to terminate a parent's rights for violating a court's order are found in section 161.001(b)(1)(O) of the Family Code.[22] Under subsection O, which is the section Mother has challenged in issue five, the Department was required to prove by clear and convincing evidence that Mother:

> [1] failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of

---

[19] *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 267).

[20] *See In re H.R.M.*, 209 S.W.3d at 108.

[21] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

[22] *Id.*

the child [2] who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months [3] as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.][23]

Mother's arguments focus entirely on whether she violated a court order, and she does not claim the evidence fails to show that Beth was not in the Department's custody for the required nine months or that Beth was not removed due to neglect. During the trial, a caseworker who worked for the Department on Mother's case testified that Mother did not complete her court-ordered parenting plan. The caseworker testified that she discussed the parenting plan with Mother and explained to Mother the actions Mother needed to take to regain custody of Beth. The parenting plan, which the trial court admitted into evidence at trial, required Mother to: (1) find an appropriate caregiver to help her provide for her daily activities, such as housekeeping, meal prep, personal hygiene, medication maintenance, and medication reminders; (2) comply with an independent review of proper medications by a licensed psychiatrist and medical doctor of the Department's choosing, as well as continued monitoring by the Department's caseworker; (3) sign a medical release form; (4) complete a psychological evaluation and follow the psychologist's recommendations; and (5) obtain and maintain appropriate safe and clean housing

---

[23] *Id.*; *see also In re S.M.R.*, 434 S.W.3d at 582.

in a drug-free environment with utilities that are operational. When explaining what Mother did to comply with these requirements, the caseworker testified that Mother signed a medical release, but "that's pretty much it."

In her brief, Mother does not dispute that she failed to comply with each of the requirements in her parenting plan. Instead, Mother claims the evidence is legally and factually insufficient because the Department failed to comply with the Americans with Disabilities Act (ADA) by tailoring her parenting plan to her disability.[24]

Under the trial court's order, which the court signed after the adversarial hearing, the Department had the burden to prove that Mother violated the terms of the order. We note that the order the trial court signed requiring Mother to follow the terms of her parenting plan was never modified after it was signed. Moreover, the terms of the order are silent on the Department's duty to tailor Mother's plan to accommodate any claimed disabilities.

---

[24] 42 U.S.C.S. §§ 12101-12213 (LEXIS through Pub. L. No. 116-8). Since no medically trained experts testified in the trial, there is not much evidence in the record to explain what disabilities Mother has or how they interfered with her ability to comply with the court's order. Mother did not testify in the trial, so there is very little evidence in the record explaining how her disabilities interfered with her ability to meet the requirements of the parenting plan the trial court ordered her to follow.

When evaluating whether that factfinder's decision is supported by sufficient evidence, we measure the evidence admitted in the trial against the requirements in the trial court's order. We do not measure the sufficiency of the evidence in an appeal based on some hypothetical order the trial court might have entered had Mother asked the trial court to modify the order that the trial court found she violated.[25] After the trial court ordered Mother to comply with the parenting plan, the record does not show that Mother ever made the trial court aware she had a disability that interfered with her ability to comply with the trial court's order.[26]

Measuring the sufficiency of the evidence by the terms of what the order required Mother to accomplish, the record shows the Department proved by clear and convincing evidence that Mother did not obtain a psychological evaluation or maintain housing suitable to raise a child. Both were requirements under the order the trial court signed following the adversarial hearing. Here, the record contains legally and factually sufficient evidence to allow the trial court to form a firm belief

[25] *See generally Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (explaining that a challenge to the sufficiency of the evidence must be measured against the court's charge as submitted, not some other unidentified law, when the opposing party fails to object to the charge).

[26] *See* Tex. R. App. P. 33.1 (preserving error for appellate review about the terms of an order requires the complaining party to show that she presented her complaint to the trial court by making a timely request, objection, or motion and that the trial court ruled on the request).

or conviction that Mother failed to comply with the requirements of the trial court's order.[27]  For these reasons, we overrule Mother's fifth issue.

Because we have overruled Mother's fifth issue challenging the trial court's judgment under subsection O, we need not address issues one through four, which challenge the trial court's findings based on other subsections of section 161.001(b)(1).[28] Under Texas law, when sufficient evidence supports one of the findings under section 161.001(b)(1) of the Family Code authorizing the trial court to terminate the parent-child relationship, that finding, coupled with the best-interest finding, allows the appellate court to affirm the judgment.[29]

C. Analysis—Best-Interest Finding

In her sixth issue, Mother argues the record fails to show that terminating her parental rights is in Beth's best interest. In a parental-rights termination case, the Department must establish by clear and convincing evidence that terminating a parent's rights to her child is in the child's best interest.[30] There is a "rebuttable

---

[27] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O); *In the Interest of J.E.M.M.*, 532 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

[28] *See* Tex. R. App. P. 47.1 (requiring the appellate court's opinion to address each issue necessary to the resolution of the appeal).

[29] *In re S.M.R.* 434 S.W.3d at 580.

presumption that the appointment of the parents of a child as joint managing conservators" will serve the child's best interest.[31] That said, courts must also presume that a prompt and permanent placement of a child in a safe environment is in the child's best interest.[32] In reviewing a best-interest finding, we consider the nine non-exhaustive factors identified by the Texas Supreme Court in *Holley v. Adams*.[33]

---

[30] Tex. Fam. Code Ann. § 161.001(b)(2); *see also In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012).

[31] Tex. Fam. Code Ann. § 153.131(b) (West 2014); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parent).

[32] Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2018).

[33] In *Holley*, the Texas Supreme Court applied these factors in reviewing a best-interest finding:

> • the child's desires;
>
> • the child's emotional and physical needs, now and in the future;
>
> • the emotional and physical danger to the child, now and in the future;
>
> • the parenting abilities of the parties seeking custody;
>
> • the programs available to assist the parties seeking custody;
>
> • the plans for the child by the parties seeking custody;

During the trial, six-year-old Beth testified that she currently lives with her foster parents. The testimony shows that Beth previously lived with the same foster parents, for about nine months, after Mother and the Department agreed to allow Beth to be placed in a foster home in April 2015. Beth testified that she calls her foster parents "Mommy and Daddy," and that her favorite place to be is with them. Beth admitted that, while she likes talking to Mother on the phone and spending time with Mother when Mother visits, she would prefer to live with her foster parents forever.

Both of Beth's foster parents testified during the trial. Beth's foster mother testified that Beth had been living in the foster parents' home with their three other children since June 1, 2017. According to Beth's foster father, Beth is "doing extremely well." Both foster parents testified that Beth has bonded with the children living in their household, and that the children refer to Beth as their sister. The

---

- the stability of the home or the proposed placement;

- the parent's acts or omissions, which may indicate that the existing parent-child relationship is improper;

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

15

evidence allowed the trial court to conclude that the foster parents are meeting Beth's emotional and physical needs, and that they can do so in the future.

On the other hand, the evidence admitted in the trial allowed the trial court to conclude that Mother's lifestyle and physical condition had "deteriorated significantly" since the Department sued. When the Department removed Beth from Mother's home, Mother agreed that she was unable to manage Beth's or her own daily needs without a caregiver. Yet, even after Mother admitted she needed a caregiver, there is no evidence showing that she obtained someone to assist her with caring for herself and Beth. The evidence in the trial shows that Mother has not worked since the Department filed suit but receives social security disability income. The record before the trial court does not disclose the nature of her disability except to the extent there is testimony showing that Mother was unable to follow directions for taking the medications she was being prescribed without someone's help. Mother also failed to follow each of the requirements of her court-ordered parenting plan.

When trial courts engage in a best-interest analysis, the child's need for a prompt and permanent placement in a safe environment is of paramount concern.[34] The testimony in the trial shows that Mother moved at least seven times after the Department filed the suit to terminate her rights. During the proceedings before the

---

[34] *See* Tex. Fam. Code Ann. § 263.307(a).

16

trial, the evidence shows that Mother lived with a series of roommates who either stole from her or physically abused her. At times, Mother was homeless and sleeping in her car. Moreover, the trial court was not required to infer that Mother could have provided evidence that contradicted the evidence admitted in the trial had she testified. Given the evidence that was probative on Mother's failure to make appropriate arrangements for Beth's housing, and the number of times Mother moved while the proceedings were pending, the trial court could reasonably conclude that Mother cannot provide Beth with housing that is appropriate and safe for a child.

The testimony in the trial shows that the Department's goal for Beth was to have her adopted by her foster parents, who expressed a strong interest in adopting her. Mother's plan for the child, as described by Beth's foster mother, was to move with Beth to Louisiana. Both the caseworker assigned to Mother's case and Beth's court-appointed special advocate testified that terminating Mother's parental rights so Beth could be adopted by her foster parents would be in Beth's best interest. We conclude the evidence admitted in the trial is legally and factually sufficient to

support the trial court's finding that terminating Mother's rights served Beth's best interest.[35] We overrule Mother's sixth issue.

## Conclusion

We affirm the trial court's judgment terminating Mother's and Father's parent-child relationship with Beth. Although Father's court-appointed appellate counsel filed a motion to withdraw, we deny that motion because appellate counsel's duty requires court-appointed counsel to represent the client until the client has either exhausted or waived any further appeals.[36] Should Father advise his counsel that he desires to pursue an appeal, counsel may satisfy the obligation that she has to her client "by filing a petition for review that satisfies the standards for an *Anders* brief."[37] Accordingly, we affirm the trial court's judgment.

AFFIRMED.



HOLLIS HORTON
Justice

---

[35] *See In re J.F.C.* 96 S.W.3d at 266 (explaining that the appellate court's analysis should determine whether the factfinder, under a clear and convincing standard of proof, could have formed a firm belief or conviction about the Department's claims).

[36] *See* Tex. Fam. Code Ann. § 107.016(3)(B) (West Supp. 2018); *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016).

[37] *In re P.M.*, 520 S.W.3d at 27-28.

18

Submitted on March 26, 2019
Opinion Delivered April 25, 2019

Before McKeithen, C.J., Kreger and Horton, JJ.